**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Rashawn Manigan,

    Plaintiff,

    v.                                      Case No. 1:06cv563

SORTA, *et al.*,                      Judge Michael R. Barrett

    Defendants.

**OPINION & ORDER**

This matter is before the Court upon Plaintiff's Motion for Partial Summary Judgment (Doc. 54), Defendant Southwest Ohio Regional Transit Authority's ("SORTA") Memorandum in Opposition (Doc. 64), and Plaintiff's Reply (Doc. 68). Defendant SORTA has also filed a Motion for Summary Judgment (Doc. 55). Plaintiff filed a Memorandum in Opposition (Doc. 69) and Defendant filed a Reply (Doc. 69).

**I.    BACKGROUND**

In October of 2003, Plaintiff Rashawn Manigan began working as a bus driver for Defendant SORTA. (Doc. 41, Rashawn Manigan Depo. at 49) Since 1992, Manigan has had an artificial right knee and partially artificial right hip as the result of a car accident. (Id. at 74-82) In 2005, Manigan was wearing knee braces on both knees except when resting at home. (Doc. 54, Ex. B, Manigan Decl. ¶ 6) Manigan was also wearing an ankle/foot orthosis on his left ankle and foot, and was not able to walk more than a few feet without this appliance. (Id. ¶ 7) Manigan had also been using a cane since his accident, and needed it to walk almost every day. (Id. ¶ 8) Even with these appliances, Manigan was

unable to walk more than approximately fifty yards without stopping, and had to walk at a pace slower than that of an average person. (Id. ¶ 9)

SORTA's bus drivers are represented by a union. (Manigan Depo. at 97) Under the collective bargaining agreement between SORTA and the union, seniority is based on date of hire. (Id. at 106) Drivers are able to select their work assignments four times per year based upon seniority. (Id. at 109-110) Drivers can pick to be a "regular operator" or a "sub-operator." (Doc. 55, Ex. 1, Schmidt Aff. ¶ 6) A sub-operator is used to cover for regular operators. (Id.) Sub-operators pick their work assignments in order of seniority on a weekly basis. (Id. ¶ 8) Sub-operators can pick from either the "Hold-down" or "Rotating Board." (Id.) The Hold-down Board consists of the runs of regular operators who are on leave. (Id.) On the Rotating Board, drivers pick their days off and are then assigned runs on a daily basis. (Id.)

Manigan worked as a sub-operator and preferred to work from the Rotating Board because he was rarely assigned a run which required him to drive more than eight hours per day. (Manigan Decl. ¶¶ 11, 13) Manigan was restricted by his doctor from driving more than eight hours per day. (Doc. 53, Clyde Henderson, M.D. Depo. Exs. 3, 4) In 2004, Manigan's supervisor was Robert Broadnax. Broadnax ensured that Manigan did not drive more than eight hours by allowing Manigan to exchange runs with another driver assigned to a shorter run at the same time. (Manigan Depo. at 162-63; Manigan Decl. ¶ 16) If Manigan could not exchange his run, Manigan would call for "sick relief" and Broadnax would find someone to finish out Manigan's route which was in excess of eight hours. (Doc. 60, Robert Broadnax Depo. at 86-87; Manigan Decl. ¶ 18)

On January 27, 2005, Manigan's doctor issued a note which stated: "Patient may

not drive a bus more than 8 hours a day due to knee condition, until further notice." (Manigan Depo. at 155-56 & Ex. 7) Manigan claims that his new supervisor, Arnold Isham, was not accommodating his work restriction as Broadnax had done. (Manigan Decl. ¶ 20) On February 16, 2005, Manigan met with Vaughn Davis, the Director of Human Resources. (Manigan Depo. at 130-31) Davis recommended that Manigan select a regular run that complied with his doctor's restriction in the upcoming February divisional pick. (Id. at 131-33; Doc. 58 Vaughn Davis Depo. at 27, 32) Davis repeated this suggestion in a subsequent phone conversations. (Id. at 140) According to Manigan, such a route was not available because of his seniority. (Id. at 137-38) SORTA disputes this contention, and points to evidence showing that there were four drivers with lower seniority than Manigan who chose regular runs with driving times less than eight hours. (Schmidt Aff. ¶ 19 & Exs. 1-2)[1]

---

[1] For the first time, in his Second Declaration attached to his Response in Opposition to SORTA's Motion for Summary Judgment, Manigan states that the reason he did not pick these runs was because he missed his opportunity to make his pick. (See Doc. 63) In his Second Declaration, Manigan explains that on Feburary 16, 2005, he was scheduled to make his quarterly pick for the period of March to June of 2005. (Id. ¶ 3) Manigan states that he had a meeting scheduled with Davis that afternoon. (Id. ¶ 4) Manigan states that when the meeting ended, he went to make his pick, but was told that he had already been assigned to be a sub-operator, and they had moved on to the next pick. (Id. ¶ 5) Manigan made no mention of "missing" his pick in his deposition:

> Q: After that [initial] meeting [with Davis] where you said you'd look in the idea of picking a run that satisfied your restrictions, did you, in fact, look into that?
>
> A: Yes, sir.
>
> Q: Okay. What did you do to look into it?
>
> A: I checked the – the run books.
>
> Q: Okay. And where are – where are the run books kept?

At the same time, Manigan informed Isham that he would need to take medical leave to have knee surgery. (Doc. 56, Arnold Isham Depo. at 80-81, Ex. 3) Manigan provided Isham with paperwork from Manigan's doctor which stated that Manigan would need to be on leave from April 22, 2005 until July 22, 2005. (Manigan Depo., Ex. 9)

On March 21, 2005, Manigan wrote a letter to Davis acknowledging their initial meeting on February 16, 2005 and the subsequent telephone conversations regarding an accommodation of his eight-hour driving restriction. (Manigan Depo., Ex. 11) In the letter, Manigan states that his requested accommodation is an "assignment to a split run, or an extra run in combinations." (Id.) Manigan also states: "Your solution was for me to try and pick a split run, or a route with a layover which would allow me to stand and stretch my legs

---

| | | |
|---|---|---|
| A: | | In the – in the Division, the – the Club Room Area at the Queensgate Division. |
| Q: | | Okay, And what did you find when you checked the run books? |
| A: | | That typically I didn't have enough seniority to pick a run that would satisfy my needs. |
| Q: | | When you say "typically," did you see some runs in there that you could have picked -- |
| A: | | No, sir. |
| Q: | | – that would have met your needs? |
| A: | | No, sir. No split runs, no. |

(Manigan Depo. at 137) After a motion for summary judgment has been made, a party may not create a genuine issue of material fact by filing an affidavit that contradicts earlier deposition testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986). Moreover, SORTA has presented the supplemental affidavit of John Schmidt which states that in the event that there was a problem with Manigan's pick, there was a process called "backing up," where a union representative could have helped to "back up" the process to correct the problem. (Schmidt Supp. Aff. ¶ 5)

at the layover is not a practical solution at this time." (Id.)

On April 19, 2005, Manigan filed a grievance, claiming that SORTA was refusing to accommodate his doctor's restriction and make an ADA accommodation. (Manigan Depo., Ex. 12)

In May of 2005, Isham asked Manigan to undergo a fitness for duty evaluation. (Id. at 188-190) The doctor who performed the evaluation agreed with Manigan's doctor that he should not drive a bus more than eight hours per day. (Id., Ex. 14)

On May 2, 2005, Isham sent a letter to Manigan stating:

> I spoke with Vaughn Davis regarding the ADA accommodation and he stated he informed you that you do not have a **valid** ADA issue.
>
> I denied the doctor's note <u>with the restriction</u> on it, due to The Metro does not have any type of light or restricted duty.
>
> Grievance denied for the reasons stated above.
>
> As I mentioned above The Metro doesn't have any type of light or restricted duty, yet you have offered in this grievance that you're under a doctor's care with restriction. I sent you to The Metro's doctor, who after your physical exam and speaking with your doctor confirmed you are under <u>restriction</u> preventing you from performing your duties. I have no choose [sic] but to take you **out of service** until you summit [sic] a note stating that you can work without any restriction.

(Id., Ex. 15) (emphasis in original). SORTA denied the grievance at each step, and the Union voted not to arbitrate the grievance. (Id., Exs. 12, 21)

On May 6, 2006, Isham sent a letter to Manigan informing him that his leave for his knee surgery had been approved and he would be on leave under the Family Medical Leave Act until July 22, 2005. (Isham Depo., Ex. 7) However, Manigan elected to not have the surgery.

During the next quarterly pick in May of 2005, Manigan selected a run which

required less than eight hours of driving time. (Manigan Depo. at 197, 207) On June 7, 2005, Manigan's doctor issued a note which stated: "Able to return to regular duty as a Metro bus driver." (Id. at 201-202 & Ex. 19) Manigan returned to work on June 18, 2005.

In his Second Amended Complaint, Manigan brings claims under the Americans with Disabilities Act and Ohio discrimination law, Ohio Revised Code § 4112.02(A).

In his Motion for Partial Summary Judgment, Manigan argues that he is entitled to summary judgment on the issue of liability, and this matter should proceed to trial solely on the issue of damages. In its Motion for Summary Judgment, SORTA argues that it is entitled to summary judgment on all claims, and this matter should be dismissed.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be

insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

   **B.    ADA**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Manigan claims that he is disabled or SORTA regarded him as disabled and SORTA discriminated against him by refusing to accommodate his disability.

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show "(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008), *quoting Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). The third element requires that the plaintiff suffer an adverse employment action. *Id.*, *citing Plautz v. Potter*, 2005 WL 3479840, *4 (6th Cir. Dec. 21, 2005) (unpublished).

   **1.    Disability**

The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). Under the ADA, "substantially limits" means:

   (1) unable to perform a major life activity that the average person in the

> general population can perform; or (2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). An impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA. *Mahon v. Crowell*, 295 F.3d 585 (6th Cir. 2002). Courts must also consider the impact of a limitation in light of any remedial measures that may reduce the effect of the plaintiff's impairment. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999) ("[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into account when judging whether that person is 'substantially limited' in a major life activity . . .").

Manigan claims that he is substantially limited in the major life activity of walking. The Sixth Circuit considers walking to be a major life activity. *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). However, "moderate difficulty or pain experienced while walking does not rise to the level of a disability." *Id.*

There is evidence in the record that in 2005 Manigan was wearing knee braces except when resting at home and wearing an ankle/foot orthosis in order to be able to walk more than a few feet. Manigan also stated that he needed a cane most of the time to walk. Even using these remedial measures, Manigan testified that he was unable to walk more than approximately fifty yards without stopping, and had to walk at a pace slower than that of an average person. SORTA disputes this evidence, and points to Manigan's own testimony that he could get around his own house, including going up and down the stairs; could get to and from work; could perform household tasks, including raking leaves and

shoveling snow; and could engage in a variety of leisure activities, including target practice, fishing, exercising on a stationary bike, and attending his son's T-ball games. (Manigan Depo. at 39-40, 56-62, 58-59, 67) SORTA also argues that Manigan's use of the cane was not prescribed by his doctor. (Henderson Depo. at 40-41)

The Court finds that Manigan has presented sufficient evidence to establish that he was disabled under the ADA. While Manigan testified that he participated in a variety of activities, he would not necessarily be precluded from these activities if he was unable to walk more than fifty yards without stopping. The Court notes that Manigan had difficulty walking on a sustained basis, and had been using a cane since 1992. Based on this evidence in the record, the Court finds that Manigan has established the first element of his *prima facie* case under the ADA.

Manigan has argued in the alternative that SORTA regarded him as disabled. Because the Court has determined that Manigan has put forth sufficient evidence to raise a question of fact with respect to whether he has an actual disability under 42 U.S.C. § 12102(2), it is unnecessary to address his alternative argument. *Accord Hayes v. United Parcel Service, Inc.*, 2001 WL 1006162, *2 (6th Cir. Aug. 20, 2001) (unpublished).

### 2. **Qualified**

Under the ADA, a "qualified individual" is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). SORTA argues that Manigan was not qualified as a bus driver because he was not able to drive a bus over eight hours when necessary. There is no dispute that Manigan was restricted by his doctor from driving over eight hours. However, Manigan disputes whether driving over eight hours

was an essential function of the position.

"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Evidence of whether a particular function is essential includes, but is not limited to:

>   (i)    The employer's judgment as to which functions are essential;
>
>   (ii)   Written job descriptions prepared before advertising or interviewing applicants for the job;
>
>   (iii)  The amount of time spent on the job performing the function;
>
>   (iv)   The consequences of not requiring the incumbent to perform the function;
>
>   (v)    The terms of a collective bargaining agreement;
>
>   (vi)   The work experience of past incumbents in the job; and/or
>
>   (vii)  The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Manigan points to evidence in the record that the majority of the runs did not require more than eight hours of driving. (Doc. 55, John Schmidt Aff., Ex. 2) Manigan also notes that there is nothing in the collective bargaining agreement, the rules governing the Hold-down or Rotating Boards, or the job description for the bus driver position which requires more than eight hours of driving.

However, SORTA responds that even if the majority of the runs require less than eight hours of driving, a bus driver must be able to drive whatever run is available to him or her under the seniority system. As such, if the only run available to a particular driver is one that is more than eight hours, that driver must be able to drive more than eight hours. SORTA also points to Manigan's own testimony that reliance on the driving times

for each run are only an estimate, and "more often than not," drivers are required to drive longer than the estimated driving time. (Manigan Depo. at 312)

SORTA also points to a clause in the collective bargaining agreement which states that all "regular operators" may be "compelled" to run a certain number of "extras" depending on length of service. (Schmidt Aff. ¶ 10) SORTA explains that the rules for the Boards make it clear that overtime is mandatory for sub-operators. (Id.) SORTA also argues that the eight-hour requirement was essential because of the nature of the work: a driver could not park the bus and tell the passengers to get off the bus at the end of eight hours of driving. (Id. ¶ 12)

Nevertheless, Manigan argues that he could have performed, and did perform the job of bus driver with a reasonable accommodation. Specifically, Manigan argues that he should have been permitted to exchange runs with another driver assigned to a shorter run or call for "sick relief" and have someone to finish out his run. In essence, Manigan seeks an exemption from the eight-hour driving requirement. However, an employer is not required to exempt a disabled employee from an essential function of the job as an accommodation. *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998), citing Hall v. U.S. Postal Service, 857 F.2d 1073, 1078 (6th Cir. 1988). As a consequence, if the eight-hour requirement is an essential function of the bus driver position, Manigan does not survive the threshold determination of whether he is a "qualified individual with a disability." *Id.*

Even if the Court were to find that Manigan is a qualified individual with a disability, the Sixth Circuit has held that an employer is not required to make an accommodation that violates a collective bargaining agreement. *Burns v. Coca-Cola Enter.*, 222 F.3d 247, 257

(6th Cir. 2000) ("Employers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual."); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) (a reasonable accommodation by means of "reassignment will not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement."). SORTA argues that Manigan's proposed accommodation would violate the seniority system under the collective bargaining agreement. The Court finds that Manigan's proposed accommodation that he be able to work as he did under Broadnax–either exchanging runs with another driver or calling for "sick relief" and have someone to finish out his run–circumvent the collective bargaining agreement between SORTA and the union. Nevertheless, the Court proceeds, assuming *arguendo* that Manigan has established the second element of his *prima facie* case. *See Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 781 (6th Cir.1998) (explaining that the "initial burden of articulating a reasonable accommodation need not be onerous.").

### 3. Discrimination

The ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). The Act defines a "reasonable accommodation" to include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision

of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

Under the ADA, a plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Talley*, 542 F.3d at 1108, *quoting Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). "An employer, then, has the burden of persuasion to show that an accommodation would impose an undue hardship." *Id., quoting Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004). However, an employee cannot force his or her employer to provide a specific accommodation if the employer offers another reasonable accommodation. *Id.* If an employee rejects a reasonable accommodation, the individual is no longer considered a "qualified individual with a disability." *Id.*; *see also* 29 C.F.R. § 1630.9(d) (explaining that if an individual rejects a "reasonable accommodation . . . that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.").

Here, Manigan attempts to force SORTA to provide a specific accommodation in the face of SORTA's offer of another reasonable accommodation. Manigan met with Davis in February of 2005. At that time, Davis told Manigan to find a run based on his seniority which would meet his eight-hour restriction. SORTA points to evidence showing that there were regular runs available in the February 2005 pick which would have made it possible for Manigan to stay within his driving restriction. The Court finds that such a run would have been a reasonable accommodation. Manigan instead picked to be a sub-operator. (Schmidt Aff. ¶ 16) Because Manigan rejected the regular runs which met his eight-hour

driving restriction, he is no longer considered a qualified individual with a disability.

Manigan relies heavily on the May 2, 2005 letter from Isham denying his grievance to argue that SORTA refused to accommodate his disability. However, this letter was sent to Manigan after he had already been offered and rejected Davis' reasonable accommodation of picking a run in the February 2005 pick which met his eight-hour driving restriction. By May, SORTA chose to accommodate Manigan in a different manner, which was to take him "out of service" and place him on medical leave. While on leave, Manigan was able to select a run which met his eight-hour restriction in the next quarterly pick. Manigan does not challenge that his being placed on leave was a reasonable accommodation.

Manigan also argues that SORTA could have continued to accommodate him in the manner Broadnax had accommodated his eight-hour restriction. This argument assumes that SORTA was required to accommodate him in this manner. As this Court has explained:

> "If an employer chooses for whatever reason to bend over backwards to accommodate an employee, going beyond what is required under ADA, it shouldn't be punished for its efforts. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 929 (7th Cir.2001); *Vande Zande v. Wisconson Dept. of Administration*, 44 F.3d 538 (7th Cir.1995). Courts should not discourage employers from providing accommodations that may be beyond the scope of ADA requirements. *Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir. 1997). Hence, an employer's decision to cease making accommodations related to essential functions of an employee's position does not violate the ADA. *Id.*; *Shannon v. New York City Transit Auth.*, 332 F.3d 95 (2nd Cir. 2003)(citing Gilbert v. Frank, 949 F.2d 637 (2nd Cir.1991)).

*Dabney v. Ohio Department of Administrative Services*, 2006 WL 745176, *9 (S.D.Ohio March 22, 2006) (unpublished). As stated above, Broadnax's proposed accommodation circumvented SORTA's collective bargaining agreement with the union. As such, SORTA

was not required to provide this accommodation. Therefore, the Court finds that Manigan has not presented sufficient evidence that SORTA discriminated against him by failing to provide a reasonable accommodation. Accordingly, Manigan is not entitled to summary judgment on the issue of liability, and SORTA is entitled to summary judgment on Manigan's claim under the ADA.

### C. Ohio discrimination law

Given the similarity of the language used in the ADA and Chapter 4112, the Ohio Supreme Court has held that federal regulations and case law are applicable to disability discrimination claims brought under Chapter 4112. *Columbus Civil Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206-207 (1998). Accordingly, dismissal of Manigan's claim under the ADA will also resolve his state law claim. *Engle v. BearingPoint, Inc.*, 2008 WL 5416425, *8 (S.D.Ohio Dec. 30, 2008) (slip op.), citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *Hedrick*, 355 F.3d at 452 n.4. Accordingly, Manigan is not entitled to summary judgment on the issue of liability, and SORTA is entitled to summary judgment on Manigan's state law claim.

## III. CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. 54) and **GRANTS** Defendant SORTA's Motion for Summary Judgment (Doc. 55). This matter shall be **CLOSED** and **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

                                               */s/ Michael R. Barrett*
                                               Michael R. Barrett, Judge
                                               United States District Court